WOODS et al. v. BELL et al.   (No. 228.)

(Court of Civil Appeals of Texas. Beaumont. May 31, 1917. Rehearing Denied June 13, 1917.)

1. APPEAL AND ERROR ⟨⟩748(1)—ASSIGNMENT OF ERROR—SUFFICIENCY.

Assignments of error defective because containing statements of fact outside the record, etc., will be considered where appellants, and counsel representing them, are negroes.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3058, 3061–3064.]

2. TRUSTS ⟨⟩44(1) — CREATION — EXPRESS TRUST.

Evidence that property was conveyed to certain parties as trustees for the colored people of a certain county, and that the trustees controlled it in such capacity, sustains a finding that the colored people owned a beneficial interest, instead of a fee-simple title, in the property.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 66.]

3. EVIDENCE ⟨⟩31 — JUDICIAL NOTICE—CITY CHARTER.

Judicial notice will be taken of Houston city charter, which was enacted by a general legislative act.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 40, 41.]

4. MUNICIPAL CORPORATIONS ⟨⟩224 — CHARTER POWERS—PARKS.

Houston city charter, empowering the city to maintain parks, authorizes it to accept management of a park in trust for the benefit of the colored people of Harris county.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 623–625.]

5. CHARITIES ⟨⟩47—JUDICIAL APPOINTMENT OF TRUSTEES—SUFFICIENCY OF EVIDENCE.

Evidence of various trustees of a park devoted to benefit of colored people held to sustain a finding that the revenue derived from the park would be insufficient to pay indebtedness already accrued and current expenses.

[Ed. Note.—For other cases, see Charities, Cent. Dig. § 85.]

6. EQUITY ⟨⟩91 — PARTIES — CESTUI QUE TRUST.

Evidence that a corporation managing a park for the benefit of colored people had been dissolved, and that the park was managed by trustees elected at a negro mass meeting, sustains a finding that colored citizens had a beneficial interest in the park authorizing a suit in equity for readjustment of the property's management.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 248–251.]

7. CHARITIES ⟨⟩47—JUDICIAL APPOINTMENT OF TRUSTEES—JURISDICTION—TRUSTS.

Where a park intended for the benefit of colored people of Harris county had been managed through trustees elected by such beneficiaries, but was in imminent danger of being seized by creditors, a court of equity has jurisdiction to transfer its control to the city of Houston,

which would discharge the indebtedness and manage it for the original purposes.

[Ed. Note.—For other cases, see Charities, Cent. Dig. § 85.]

Appeal from District Court, Harris County; Wm. Masterson, Judge.

Suit by J. B. Bell and others against C. N. Love and others in which the City of Houston, L. W. Woods, and others intervened. Judgment for plaintiffs, and certain interveners appeal. Affirmed.

M. H. Broyles, of Houston, for appellants. Fisher, Campbell & Amerman and J. C. Hutcheson, Jr., all of Houston, for appellees.

BROOKE, J. This suit was instituted by J. B. Bell and three others, representing themselves to be colored citizens of Harris county, Tex., complaining of C. N. Love and six others, alleging in effect that the defendants were the duly chosen, elected, and qualified directors or trustees of the Emancipation Park Association, having been chosen in accordance with the by-laws embraced in an order of court in one of the suits that annually arise in Harris county over the management of the Emancipation Park Association. As shown by the pleadings, and as disclosed by the undisputed facts, these directors or trustees have, for a number of years, been elected at a mass meeting of the colored citizens of Harris county, voting on Emancipation Day at the Emancipation celebration.

It was established that the Emancipation Park tract in controversy was conveyed by Marshall C. Wellborn et al. to Richard Allen et al., trustees, on July 10, 1872, for the sum of $800, for the use and benefit of the colored people of Harris county, known as the "Festival Association." The court found, and it is undisputed, that the only title which the defendants had to the property was as successors to such trustees, and it is disclosed by the proof and the pleadings that these men were chosen not by stockholders in a corporation, but by the colored people in mass meeting assembled.

The suit was brought for the benefit of the plaintiffs, as colored citizens of Harris county, and, as such, entitled to participate in the benefits of the trust declared in said deed, and for the benefit of the other colored citizens of Harris county similarly situated, for the purpose of advising the court that owing to the fact that the property was not self-sustaining, it had become largely indebted and was about to be lost to the colored people forever, and asking the court to devise some scheme by which the trust could be perpetuated for the benefit of the colored people, for use as an Emancipation Park celebration grounds.

The defendant trustees answered, admitting the facts pleaded, and that the trust was about to fail, and suggested to the court that the city of Houston was ready, willing, and able to take over and manage the park as trustee, for the benefit of the colored people, provided the trust could be legally reposed in the city of Houston. The city of Houston likewise intervened in the suit, declaring its readiness to take over the park for the benefit of the colored people forever, and expressed its willingness, if it could be protected in the payment, to pay all of the debts, amounting to about $5,000.

The court, in accordance with its equity powers, designated the plaintiffs as representatives of the colored people, for the purpose of prosecuting the suit, and designated the defendants also as representatives of the colored people to defend the suit, and authorized the intervention of any and all colored people of Harris county, who saw fit to intervene, either as plaintiffs or as defendants. In response to this order, several hundred colored people intervened, and ranged themselves on either side of the controversy. Upon hearing, the court found, in effect, that the deed above referred to vested the property in the trustees for the benefit of the colored inhabitants of Harris county, Tex., of whom there were about 20,000, and that the present trustees, defendants herein, hold the property in that capacity because of their election at the colored mass meeting at the 19th of June celebration previous. He also found that the trust was about to fail because the colored people and the trustees were unable, from their own funds, or from the income of the property, to sustain the property and to carry on the trust. He further found that the city of Houston was a proper trustee to be named, and upon request of the trustees, who surrendered their trust to the court, he appointed the city of Houston, trustee for the benefit of the colored people, to continue the trust. The judgment further provided that the city of Houston be authorized to pay off the existing indebtedness, which was in imminent danger of being foreclosed, and decreed that the city of Houston should have a lien for this amount paid, without interest, which lien could be foreclosed only in the event that the property was ever divested out of the city by any suit or action brought for the benefit of the colored people of Harris county. From this judgment, the interveners opposing the court's action excepted and gave notice of appeal, and the case is properly before this court for adjudication.

It would, perhaps, be well to set out in full the findings of fact and conclusions of law filed by the court as follows:

"Findings of Fact.

"The court finds that on July 10, 1872, Marshall C. and Sarah J. Wellborn executed their certain deed to 'Richard Allen, Richard Brock, Frank Kecland, John Graham, John Sessums, Johnson Rice, Taylor Burke, Daniel Riley, and Tillman Bush, trustees of the colored people of Harris county, Tex., known as the Festival Association,' conveying the following described property, known as lot No. 25 in the Holman survey, in the city of Houston, containing ten acres. The habendum clause in said deed reads

as follows: 'To have and to hold unto them, the said Allen, Brock, Keeland, Riley, Graham and Bush in their capacities as trustees for the colored people of Harris county, known as the Festival Association, and their successors in office.' The consideration recited in said deed is $800 coin in hand paid, which was in fact paid to the grantors in said deed.

"The court finds that the above-named trustees undertook to devote said tract of land to the use and benefit of the colored people of Harris county as a park, for the celebration of the emancipation of the slaves. From time to time the colored people of Harris county, Tex., in various meetings assembled, elected trustees to carry on said park for their use and benefit, and that from the date of said deed to the present time the colored people have been in possession of said park, through their said trustees, who have acted solely as trustees, for the use and benefit of the colored people of Harris county, Tex. That the plaintiffs in this suit are colored citizens of Harris county, Tex., and that there are in excess of 20,000 colored citizens of Harris county, Tex., interested as citizens in said park. The defendants herein are the present board of trustees elected at a meeting of the colored citizens of Harris county, Tex., on the 19th day of June, 1915, and as such trustees have the right to the control of the above-described property, for the use and benefit of the colored people of Harris county, Tex. That the various boards of trustees, in managing and controlling said park, have at all times recognized that they were undertaking to execute a trust for and on behalf of the colored citizens of Harris county, Tex.

"The court finds that in the management and control of the Emancipation Park above described, by the various boards, including the present board, there have been incurred the following items of indebtedness, some of which are secured by statutory liens, and some by deed of trust liens, and some by open accounts, aggregating in all the sum of $5,247.32, to wit:

City taxes, penalty, interest, etc., for 1914 ............................... $ 539 20
City taxes for 1915 ......................... 512 64
State and county taxes, penalty, interest and costs for 1914 ............ 156 86
State and county taxes for 1951 ...... 155 53
Union National Bank ....................... 300 00
C. L. Bernay note, with interest.... 1,050 00
Mrs. Mollie A. Baker note, with interest ....................................... 527 26
Lincoln R. Jones, promissory note... 25 00
J. B. Farthing Lumber Company (due J. W. H.) ................................... 26 00
Unpaid police account June 19 and 21, 1915 (paid by J. W. Hubert).. 18 00
Advertising board's annual report... 18 00
Office rent June 1 to October 31, 1915, at $2.50 ................................ 12 50
City water .................................... 5 55
J. B. Bell, interest on note .......... 12 00
Sam Allen, janitor ........................ 21 00
Unpaid election expense .............. 30 00
Lark Severe ................................ 11 50
F. A. Martinier, cleaning up park after storm ................................ 45 00
W. E. Miller, paid V. M. Clark attorney's fees ............................... 10 00
Farthing Lumber Company ........... 397 87
Richard Butler, building fence ...... 90 00
J. A. Wolfram, wiring park .......... 34 00
Attorney's fees, Fisher, Campbell & Amerman, for perfecting title and transfer .................................... 250 00
Attorney's fees, Woods, Harris & King, in cause of State v. Bowman et al. ......................................... 250 00
Compromise settlement in above cause 750 00
          Total ..................... $5,247 32

"The court finds that the improvements upon said property are in a dilapidated condition, and in urgent need of repair, and that there are no funds with which to make such repairs.

"The court finds that the creditors owning the claims above set out are pressing the trustees for payment, and that foreclosure proceedings have already been begun, and judgments taken upon some of the secured debts above set out; and that the trustees have no sources of revenue to provide for the payment of the debts that have accrued, and that will accrue, in the management of said park, and that the taxes expected to accrue upon said property in the future will be in excess of $750 per annum for the payment of which the trustees have no funds.

"The court further finds that the trustees in charge of said park, defendants herein, are unable to further carry out the trust imposed upon them by virtue of said deed, and by virtue of their election by the colored people of Harris county, Tex., and that they are absolutely unable to pay for the existing indebtedness, and meet the anticipated indebtedness, and have tendered their trust into this court for administration and perpetuation.

"The court finds that the beneficial interest in and to the property above described is, and has since the date of said deed always been, in the colored people of Harris county, Tex.; but the court finds that the above-named trustees, as well as the colored people of Harris county, Tex., are unable to provide funds for meeting the indebtedness already accrued against said park, and that will accrue in the future, and that unless the court, acting as a court of equity, can devise some plan by which the indebtedness of the said park already accrued can be paid, and the future indebtedness provided for, that the colored people of Harris county will lose said park by foreclosure, and that the trust created by the deed herein referred to must necessarily fail. .

"The court finds that the city of Houston, a body corporate, is authorized by charter to accept this trust, and to execute it, for the benefit of the colored people of Harris county, Tex., and in its petition in intervention has offered to accept said trust and execute it, and as an incident thereto has agreed to pay off and discharge all of the obligations already accrued; and further agrees, under proper ordinance of the city of Houston, to maintain said part as a park and recreation ground for the colored people of Harris county, Tex., provided it can be secured in the payment of all sums paid out by it for existing indebtedness, and that it have foreclosure only in the event that at some future time the colored people of Harris county are successful in taking possession of said park from the city of Houston.

"The court finds that the trustees are willing to surrender their trust, and have so notified the court by their pleadings filed herein, and have suggested that the city of Houston is a proper and suitable trustee. The court finds that unless the equitable powers of the court are exercised in taking charge of the trust tendered into court by the trustees, and in appointing a suitable trustee to perpetuate said trust, that the same will necessarily fail on account of the inability of the trustee to pay the operating expenses of the park and the indebtedness which has accrued and will accrue in the management thereof.

"Conclusions of Law.

"The court concludes as a matter of law that the colored people of Harris county, Tex., are the beneficial owners of the property described in plaintiff's petition, and known as Emancipation Park, and that the title is in the trustees merely as trustees, and that the trustees, as such, have no authority to delegate their trust to any person or corporation able to carry on said trust for the benefit of the colored people of Harris county, Tex., and the trustees having surrendered their trust, and the court having found

that the trust is about to fail, the court concludes that it is the duty of the court to appoint some suitable trustee for the purpose of perpetuating said trust for the benefit of the colored people of Harris county, Tex., and that there is nothing in said deed or in the law to prohibit the city of Houston from acting as trustee in lieu of the trustees who have surrendered their trust to this court. The court concludes that in surrendering their trust to this court, and in the appointment by this court of the city of Houston, that there has been no delegation of the powers of the trustees but a surrender thereof, and that the city of Houston, by virtue of the decree entered herein, succeeds to all the rights of the trustees heretofore in charge of said park, not by virtue of any delegation of authority, but by virtue of the decree of this court; and that the beneficial ownership and right to enjoy said park in the future shall be, as it has been in the past, in the colored people of Harris county, Tex."

[1] Our attention is called to the assignments of error, and to the fact that the said assignments do not comply with the rules, for the reason that the assignments, statements, and arguments are all intermixed with statements of various facts not to be found anywhere in the record, etc. We find this contention to be true. However, from the fact that the people interested in the subject-matter are colored people, and from the further fact that they are being represented by colored counsel, who appeared in this court, it is judged to be proper that the strict rules be not enforced, and that the brief be considered, which will be accordingly done.

[2] Complaint is made that the court erred in finding that the colored people of Harris county, Tex., owned only a beneficial interest in the property in controversy, to wit, lot 25 of the J. S. Holman survey in the city of Houston, on the south side of Buffalo bayou, containing ten acres, and it seems to be contended and claimed that the evidence shows that the fee-simple title to the property is in the colored people of Harris county, Tex., and that the status of the property in controversy is not of that character of estate that will bring it within the jurisdiction of equity.

The evidence shows that the property was conveyed to Richard Allen and others, by deed in 1872, as trustees for the colored people of Harris county, and it is further shown that the trustees controlled it in that capacity. The court held that the trustees were elected by mass meeting of the colored people, it being admitted that they were so elected, and that the said property was so held by said trustees for the beneficial interest, being in the colored people of Harris county, Tex., only subject to be managed and controlled by the trustees. This court is unable to reach any other conclusion, and we see no merit in the contention of appellant. Therefore the assignment is overruled.

[3, 4] Complaint is made of the finding of the court that the city of Houston, a body corporate, is authorized by charter to accept the trust, exercise the authority, and be subrogated to the rights of the board of directors of the "Colored Emancipation Park Association," for, it is claimed, the record does not show that the charter of the city of Houston was adduced in evidence upon the trial of this case. The charter of the city of Houston, we find, was made by a general act of the Legislature, and authorized the city to maintain parks, and this court will take judicial knowledge of the said charter, and hold there was no necessity for its being offered in evidence. We are unable to see merit in the contention of appellant, and the assignment is overruled.

[5] The third assignment of error complains:

"That the court erred in finding, holding, adjudging, and decreeing that the property in controversy cannot be devoted to any uses which will produce a sufficient revenue for the paying of the expenses incident to the ownership and management of said property, for in the deed of conveyance by which title passed from the grantor to the grantee, there is neither word nor phrase, either on the part of grantor or grantee, in any wise restricting the uses to which the said property may be devoted; and the record shows that the property in controversy is worth $40,000 or $50,000, and lies reasonably close in within the city limits of the city of Houston, and consists of ten acres of land, and there is additional evidence in the record showing that the only necessary expense annually accruing against the said property is a tax of $750, and that the rental income under the present management is more than $1,800 per year."

The court found that debts which had accrued amounted to $5,347.32, which the trustees were unable to pay. The secretary, W. E. Miller, testified that he is secretary of the board of trustees of the Emancipation Park Association; that as such secretary he is the custodian of the books and accounts of the association; that he has in his possession a statement showing the liabilities of the association; that the total amount of those liabilities is $4,500, except that it does not include an amount proposed in a settlement of the litigation with Judge Gibson; that the total taxes owed by the association is $1,364; that said taxes are for the years 1914 and 1915; that some of the taxes had been reduced to judgment and execution issued on state taxes; that he had seen and was served with copy of notice of sheriff's sale exhibited to him by counsel; that in obedience to said notice the sheriff prepared to offer for sale the Emancipation Park for taxes, at the courthouse; that Judge Amerman, counsel, was instrumental in holding up the sale; that Judge Amerman had acted as counsel for the association in holding up the sale; that said taxes are not paid; he is familiar with the note of Mrs. Mollie Baker, represented by Mr. Will Hamblen; that notice was served on him, as secretary, and on the board, of the fact that the Emancipation Park was offered for sale under deed of trust notice; that he did not remember the month, but thought it was October; that said proposed sale was held up through

the influence of Judge Amerman; that Mr. Hamblen was advised of the pendency of the negotiations which resulted in this offer by the city; that it was for that reason he held up the sale; that the note had not been paid; that the receipts of revenues derived from the Emancipation Park, without reference to moneys borrowed, for the year beginning July 1, 1914, and ending June 30th, was $1,871.85; that same was applied on Mollie Baker note of $500 and on note to Judge Masterson; that the payments made to Mollie Baker and Judge Masterson did not entirely take care of their notes, but there still remains a substantial balance on their notes; that there is now in the treasury about $7; that there is no source of revenue between now and the 19th of June; that we have attempted to borrow additional money from Mrs. Mollie Baker, and we have attempted to borrow from J. B. Bell, also from the Bankers' Trust Company, which last application was handled by the president of the board, C. N. Love; that he did not know of other efforts for a loan; that he is teacher in the public schools, being principal of the Gregory graded school; that on the board the following occupations were represented: editor of a paper, blacksmith, railway route agent, cotton sampler, chief cook; that the members of the board have more than the average education of his race, and more than the average qualification as citizens; that he had been a member of the board about a year and six months; that he had been twice elected; that he had been secretary since July 1, 1914; that he was elected secretary immediately after he was first elected a member of the board; that the indebtedness against the Park Association at the time he took over the books as secretary was over $3,000; that such indebtedness represented money borrowed from Mr. Harris Masterson by a former board; that to his knowledge there were no improvements on the ground to indicate how the money was spent; that the said money had been borrowed fully a year before he was first elected to membership on the board; that his board received from the former board $9.65; that the Emancipation Park is used for picnic purposes and the celebration of the 19th of June; that they rent the Emancipation Park for $15 a day; that they average about 325 days a year for rental purposes; that he could not state how many days they rented it, but that they rented it 26 times last year; that they rented it every time they had a call for it; that it is not in demand now because it is not picnic season; that it is not true that other boards have been able to rent the park, and his board has not; that, according to the books, his board received more rental last year than any other board; that he had the supposed record of the Woods board, and the books of the Freeman board, but had not gone into details, but did know that last years' rentals were more than any

previous year; that the Woods board passed three years ago; that he did not take note of it, and did not really remember whether it was three or four years; that he did not remember whether the park was in debt at that time or not; that while he had the books he had taken no notice of it; that as he had it in his memory the larger debt was created under the Freeman board; that he would make no remark about the Woods board—that is, whether the park was in debt then or not; that the debt left by the Freeman board is what they were suffering under; that he was not connected with the board at the time the Freeman board passed out; that probably the records would show the amount of money taken over by the successors to the Freeman board, but that he had never studied the question; that he saw a published statement to the effect that the Freeman board transferred to the Alec Johnson board $1,300 or $1,500; that he did not know the $1,500 was spent, because he never stopped to study it out; that his records showed the expenditure of the $1,500; that he judged it did; that the Emancipation Park will not rent for as much as $750 a year; that he would not say that the park could not possibly be rented so as to bring an income of $700, but that it does not bring it; that he guessed the prosperity of the negroes would make the income from the park better one year than another; that the income last year was much more than any other year; that we cannot pay the $1,300 taxes, we cannot pay the $500 outstanding to Mrs. Mollie A. Baker, and some other debts we owe here; that we owe Mr. Masterson $1,000, which will be due May 19th; that we are unable to raise the money by any means.

J. B. Bell testified that he had been a resident of Harris county since 1868; that he had accumulated some property, a considerable amount for a member of his race; that some of his people say he is a wealthy man, but that he did not think so; that he had served 14 years as a member of the Emancipation Park Board; that at that time he was familiar with the incomes and revenues of the park; that they were substantially what they are now; that they were never able to keep out of debt; that the improvements had been made while he was a member of the board; that said improvements had been paid for by the old board; that they are now dilapidated and dangerous; that he is a colored citizen of this county; that among others of his race he claims the right to use the Emancipation Park as a park for emancipation and park purposes; that from a report he saw in a paper he is familiar with the debts against the park, which amount to about $4,500; that the members of the board had shown him a statement; that he was in possession of that statement; that it showed about $4,500; that he did not believe the park could pay current expenses and pay off that debt; that the value of the park is

about $40,000 or $50,000; that it consists of ten acres of ground fairly close in in the city of Houston, within the city limits; that he saw a notice in the paper that Mrs. Baker was about to foreclose for $500 they borrowed from her last year; that he was familiar with the execution issued by the state of Texas for taxes; that he is one of the plaintiffs in this suit; that he is not willing to take up that indebtedness; that it is a valuable piece of property, and he would be willing to lend money on it under the advice of his lawyer; that at one time he had loaned $1,000 on it; that he was not willing to donate a sufficient amount to retire the debts against the park; that if he took the loan it would be upon the same basis of any other loan; that if not paid he would foreclose the same as any other loan; that he was instrumental in having circulated a handful of petitions exhibited to him by counsel; that he had seen a good many colored ministers of the city and told that the city was willing to take the park as trust and maintain it if we were willing, and suggested that they read them to their people, and if they agreed to it, to have them sign the petitions; that the petitions were returned to him by the pastors he handed them to; that he had talked to a great many of the colored people, and especially the ministers, and that they ·all agreed that it was the best thing; that he knows this is the most feasible plan; that he knew of no serious opposition to the plan among the colored people; that he knew W. H. Pollard; that he was a candidate for election during the election of trustees of the park last 19th of June; that Pollard was sitting in the courtroom; that his property consists of real estate and buildings; that it is rental property; that he is familiar with the rental value of the park for park purposes, since he had been 14 years a member of the board; that while he was a member of the board they had once borrowed money to make improvements; that the same had been paid back out of the revenues from time to time; that the source of revenues was gate receipts of the 19th and 20th of June; that they had paid for all the improvements made; that when he left the board there were no debts against the park; that they turned over $30 or $34 when they left; that they were capable at that time of managing the park, but that they are not capable now with the high taxation; that he did not think that same board could handle it now; that the taxes then were $60 or $70, but that they are $600 or $700; that he had stopped and talked to counsel on the streets about this suit; that counsel had said that the colored people constitute one-fourth of the population of the city of Houston, and that he could go into court and make the city of Houston give the colored people a park, and that witness said, "Why don't you do it?" that he told counsel in that conversation on the streets that if that case was dismissed at Galveston and the title was perfectly clear, he would let them have the money, and to hold it up a few months and talk to the people, as counsel suggests here in court; that one of the plaintiffs in this suit was J. B. Bell; that B. J. Covington and H. E. Lee, other plaintiffs, are physicians; that J. D. Ryan, another plaintiff, is principal of the high school; that R. L. Andrews, another of the plaintiffs, is the biggest merchant they have in the city of Houston; that the plaintiffs stand well and have the confidence of their people; that in addition to the revenues derived from the sources hereinbefore named, the people of the county annually contribute from $400 to $500; that in spite of that fact they are unable to carry their expenses; that the people of the county contributed $299.25 last year.

L. W. Woods testified that he is a colored citizen of Harris county; that he has lived in the county about 22 years and is an intervener in this case; that if he could have learned the city's attitude he would not have been an intervener; that he had sought the city's attitude, and did not get it until this morning; that he had sought the city's attitude through the board of trustees, their representatives; that he had always favored the city's taking the park over, and wanted to know the city's position; that he had called a meeting and invited the trustees, but they had refused to come and give the city's attitude; that if the trustees had come to the meeting, he thought there might not have been an intervention; that he had served as president of the board for two years; that the revenues more than paid the current expenses for those two years; that the park was slightly in debt when he was elected, but that when he left the board it was out of debt and he turned over to his successors $403.50; that the only outstanding debt at that time was a balance of a lawyer fee of $250, which was not yet due; that he did not think a dollar of the $3,000 borrowed from Judge Masterson had been expended on the grounds, except what was turned over to the succeeding board; that he did not think the passing of the park to the city by the court would have the approval of the colored people generally at this time, but that just as he understands it this morning, he believed it would be satisfactory—that is, if they were educated up to the idea, he believed they would be satisfied; that the park was out of debt when he turned it over to the Freeman board; that his board had made the obligation with the firm of Woods, Graham & Harris; that the amount was $500; that $250 had been paid, but that the balance of $250 was not yet due, and would not be until the Gibson case was disposed of; that he knew of a proposition to have the city take over the park, but he did not know what it was; that he turned the petitions he took from the Bayou City Drug Store in to Dr. Broyles; that when he looked at one of them he saw

it belonged to Mr. Bell or Hubert, and turned it over to a party that he took away from the Bayou City Drug Store with him; that he sent it back to Hendricks; that he saw what it was; that he only read the back of it; that he read that the city would take it over, and asked the people to sign it; that he got some of the signatures on one of the petitions filed in the court by Broyles; that he could not say he had any better plan than the one proposed; that he was one of the interveners in this suit; that he was not ready to join in the request, because he did not see many of the colored people whom he had assisted; that he thought it the best thing the court could do; that he knew nothing about any one's approaching Mr. Settegast for a loan for the association; that he had heard of people who would make the loan, and believed he could get it done; that he believed he could go to two or three men who would put up the $4,500 and pay it to-day, if he recommended it; that he had some one who would undertake to pay off the $4,500 when it is due, but not as a donation, but that they would make a loan on the $40,000 piece of property; that he had the money offered for improvement of the park at 6 per cent.; that he did not know where the money could be had just now for 6 per cent., but that he thought it could be had for 6 per cent. or 8 per cent.; that he did not know what interest the trustees are paying now; that all the taxes had been paid by his board; that he owned a little property, but did not know whether he was regarded as a representative of his race; that he was a half-brother of J. B. Bell; that he felt he had the confidence of his race.

These excerpts from the testimony, in our opinion, strongly show that the court's findings of fact are borne out by the testimony, and show conclusively that the testimony, in the main, justified the findings of the court. The assignment, therefore, is overruled.

[6] By the fourth assignment of error complaint is made that the court erred in adjudging that the directorship of the board of directors of the "Colored Emancipation Park Association" is a trust of such a nature as that the "Colored Emancipation Park Association" is a cestui que trust, for the "Colored Emancipation Park Association," a body corporate, existing and doing business under and by virtue of the laws of the state of Texas, did, on the 20th day of June, A. D. 1915, elect, by ballot, in accordance with its by-laws, the board of directors, to wit, C. N. Love et al., defendants herein, to serve the said association for the term of one year from the date of its election, and was, at the time of the institution of this suit, in existence and as competent under the law as it was at the time of the election of said board of directors, defendants herein, and was, at the time of the institution of this suit, and at any time after they, the members thereof, were elected to said directorship, the only legal authority to which the said board of directors is accountable respecting the management of said property, and to which only the said board could legally surrender its trust.

The proposition under this assignment is that the parties plaintiff hold neither the legal nor the equitable title to the property in controversy, nor are they the lawful representatives of the holder of either the legal or equitable title, and are incompetent to bring a bill in equity.

There is no such corporation as the Colored Emancipation Park Association, composed of the colored people of Harris county, Tex., but the testimony shows that the said corporation was dissolved, and the evidence in this case also shows that the defendant trustees were acting as custodians of the park, not as corporate directors, but as trustees elected at a mass meeting of the colored people. The trial court found, and there is ample evidence upon which to base this finding, that the defendant trustees in this suit were in possession of the park tract as trustees, holding their authority by virtue of a colored mass meeting held on June 20, 1915, in which they were elected. The corporation formerly known as the Colored Emancipation Park Association, which once existed, was duly and legally dissolved, and this dissolution was filed in the office of the secretary of state, as shown by certificate from said department dated July 27, 1913. Therefore, there being no such corporation in existence, any decree which might have been introduced as evidence with reference to the same could have no binding force in this suit. A careful examination of the record shows there is no merit in the contention of appellants, and the assignment is overruled.

[7] Upon the fifth assignment is predicated the alleged error of the lower court in assuming jurisdiction of this cause, in the absence of any allegation on the part of either plaintiff or defendant of the insolvency of the owner, and of retaining jurisdiction when on the trial no evidence was adduced showing the insolvency of the owner. This assignment will be considered in connection with the sixth assignment, which is as follows:

"The court erred in appointing the city of Houston trustee of the 'Colored Emancipation Park Association,' for the 'Colored Emancipation Park Association' is not a cestui que trust, and even if it could be so regarded the passing of such a trust from the board of directors, composed of African-Americans, elected by African-Americans, handling a trust for African-Americans, to the city of Houston, a body corporate, whose executive and administrative officers are chosen by ballot under a local system which prohibits the African-Americans from participating therein, in violation of the Fourteenth and Fifteenth Amendments to the Constitution of the United States, would be so radical a change in the channel of the trust as to render it insupportable by the rules of equity."

The record shows in this case that the trust was about to fail for the reason that the trustees were incapable of carrying on the same; that the colored people of Harris county were the beneficiaries under the trust

deed from Wellborn et al. to Richard Allen et al.; and that the defendant trustees were acting in the capacity of trustees for the colored people. They admitted their inability to further carry on the trust, and tendered it into court to keep it from failing, and asked the court to select a trustee. The court appointed the city of Houston as trustee for the colored people, and the city accepted the trust. The court appointed representatives to appear for the colored people. We are of opinion that this was a proper practice.

In the case of J. A. Pierce v. J. A. Weaver, 65 Tex. 44, which was a case in which a conveyance was made to three trustees of a tract of land for the purpose of establishing and maintaining a school for the education of white youths of the county, the white population of the town was to have entire control of the school, but no provision was made for appointing trustees in case of vacancies. Two of the trustees died, and the donor made a second deed, conveying the property, and naming five trustees; this deed providing a manner in which new trustees from time to time might be appointed, as may become necessary, the land being conveyed for the same purpose as in the first conveyance. These trustees then conveyed to defendants in trust for the M. E. Church, and a sectarian school is maintained upon the lot. The church trustees also claimed under a deed purporting to have been made by the white population of the town. Plaintiff brought suit in behalf of the white population of the town, to have new trustees appointed under the first deed, and to have the other deeds canceled. The court, in passing upon this case, used the following language:

"The deeds each vest whatever title the makers had to the lot in the trustees; but they seem, from the terms of the deeds, to be made the mere custodians of the title, not charged with the establishment, maintenance, or control of the institution of learning which the donor contemplated would at some time be erected thereon by the white citizens of 'Sulphur Springs.' The desire was to 'aid the citizens of said city in establishing and maintaining a permanent, first-class school for the education of the white youths of the county, and in the erecting and maintaining of suitable buildings for the same, and in order to secure to the white citizens of said city of Sulphur Springs now and for all time to come a good and sufficient title to an eligible and convenient lot of ground, to be occupied and used solely for said buildings and said educational purposes.' For this purpose the title to the lot is declared to vest in the trustees and their successors 'forever, in trust for the sole use and benefit of the white inhabitants of Sulphur Springs as a site for a first-class school for whites as aforesaid.' The maintenance, control, and entire management of the school to be established seems to have been left by the donor or donors to the white inhabitants of the city of Sulphur Springs as a community, and we see no reason why they may not have the school to be conducted on the lot carried on through such instrumentalities as to them may seem proper, so long as the use is such as was contemplated. They may place the property in the hands of some one who, under their control, will undertake the maintenance and control of such a school as was contemplated by the donor. They may employ teachers, as may other communities, who shall conduct the school under such supervision as the beneficiaries, the white citizens of the city, may provide. We see no reason why they may not place the property in charge of even the trustees of the particular District Conference of the Methodist Episcopal Church, South, if they are by the inhabitants of the city thought to be proper instrumentalities with which to accomplish the intent of the donor. There would be, however, an objection to the establishment of a sectarian school on the property, for some of these persons who are made beneficiaries by the terms of each of the deeds might, as a matter of conscience, not be willing to attend a school in which the tenets of a particular church, which they believed to be untrue, were taught, and thus the free use of the property by all the intended beneficiaries in a degree be prevented. As before said, the manifest intent of the donor was to aid in the establishment of such school as was contemplated; and in effectuating that purpose the inhabitants of the city would be entitled to bring to their assistance any contribution made from the funds of the state for the support of public free schools, but this they could not do if a sectarian school be maintained on the premises. We see no reason to doubt that the property, under the terms of the donation, might be used for a public free school under the general provisions of the law, nor do we see reason to doubt that it might be used by the beneficiaries under the management of the city, if it elect to manage the public free schools therein, under the laws and section 10, article 11, of the Constitution. In whatever manner the white inhabitants may elect to carry out the intention of the donor, it will still remain the duty of the trustees to see that the property be not used for a purpose never contemplated by him. While the inhabitants of the city may select the instrumentalities for the conduct of the school as may best suit them, they have no power to turn over the possession of the property to any other persons or association of persons for all time to come, for this would be equal to parting with the title to the property entirely, which is a thing neither they nor the trustees have the power to do any more than they have to divest the trustees of the fee to the land, or themselves of the beneficial use contemplated by the donor. They must use it for the purpose intended, but may exercise a discretion as to the manner and means by which that is to be accomplished."

It being shown and being admitted that the trustees were unable to further carry on the trust, and that it was about to fail, and having tendered it into court to keep it from failing, and having asked the court to select a trustee, we are unable to see wherein the action of the court in appointing the city of Houston as trustee for the colored people, the city having agreed to accept the trust, would be either illegal or inequitable or unjust in any way. We believe that the city of Houston, under the law, could accept the trust, and could administer the same, and we believe the court was warranted in appointing said city trustee to keep the trust from failing, and to perpetuate the same, and the purposes of the trust being held in view and the park held by the said trustee for the purposes to which it was given and for which it was appropriated, to wit, for purposes of being used by the colored people alone, and for the further purpose of being used for the celebration of their emancipation and other like celebrations. In our

judgment, the passing of the trust from the hands of the trustees selected by the colored people into the hands of the city to be enforced for the purposes of the trust alone —that is, for a public park devoted to the uses alone of the colored people of the city of Houston, and the colored people of Harris county, in which to hold their emancipation and other celebrations—would not be, and in our opinion could not be, regarded as the passing of a trust from a board of directors composed of Afro-Americans elected by Afro-Americans, handling a trust for Afro-Americans, and would not be a diversion of the trust from its original purposes, and still would be a holding of the park in trust for the Afro-Americans of Harris county and of the city of Houston, for the purposes of emancipation and other celebrations, and would be, in our opinion, only enforcing a trust which was about to fail, and perpetuating a trust for the purposes to which it was originally intended. The fact that the city of Houston, the officers of which were men, perhaps, who were entirely of the white race, would not, in any way, be a diversion of the trust from its original and proper uses, and those contemplated by the creators of the trust. The fact that the trust was being carried on by trustees composed of Afro-Americans, and elected by Afro-Americans exclusively, wherein the original purposes and uses of the park were sought to be carried out, the trust itself being about to fail, to say nothing of the fact that it was tendered to the city by the trustees, would in our judgment be sufficient for the court to appoint a trustee to enforce and carry out the purposes for which it was originally intended, although the trustee appointed by the court might be a city, the officers of which were entirely composed of white citizens, and would not, in our opinion, be a radical change in the channel of the trust such as would render it insupportable by the rules of equity, but on the other hand would, we hold in this case, be necessary for the enforcement of the trust itself, for the uses and benefit of the colored people of Harris county.

A careful examination leads us to the conclusion that no error was committed by the court in the matter complained of, and the assignments are therefore overruled.

The seventh assignment of error is as follows:

"The court erred in this: That the judgment and decree, in all respects, are contrary to law, not supported by the evidence, and in disregard of the rules of equity."

The proposition under this assignment is:

"The tender or surrender of their trust on the part of the directors of the 'Colored Emancipation Park Association' to the trial court with the request and prayer that the same be passed by the said court to the city of Houston was the usurpation of power not acquired by contract nor granted by law, and a breach of good faith not tolerated by equity."

Keeping in mind the purposes for which the trust was created, and bearing in mind always the fact that the trust was about to fail, that the entire fabric was about to fall down, and the very purposes of the trust itself on the verge of being defeated and extinguished, that the persons who were then holding it in trust, and we may say entitled to hold the same, under election by the colored people in mass meeting assembled on the 19th of June, admitted that they were no longer able to carry out the purposes of the trust itself for the benefit of the colored people of Harris county, that debts had accumulated which it was not in their power to liquidate, that the receipts were not equal to the necessary expenditures, that the taxes of the city of Houston had increased a thousandfold on account, among other things, of the increased value, perhaps, of the park itself, that the best efforts of the leaders of the colored race were not able to make the receipts cover the expenditures for the purposes for which the park was intended, we know no other avenue by which the said park might be preserved to the colored citizens of Harris county, and to the city of Houston for the purposes to which it was dedicated, and which was necessary, perhaps, in a measure to the happiness of the colored people of the city of Houston and Harris county. These trustees came into court and appealed to the court to assist them to carry out the trust, appealed to the court to place the trust upon a firm foundation, in order that the ends may be accomplished to which it was dedicated, in order that the park itself might be preserved for the uses and enjoyment of the colored citizens of Harris county and the city of Houston. The court heard the prayer of these trustees, appointed the city of Houston as trustee, entered its order that the trust should be enforced for the uses and purposes to which it was dedicated, for the enjoyment and uses of the Afro-Americans of the city of Houston and Harris county forever, and in this use of the equity powers, we do not believe that the court exceeded its power, or that there was any diversion of the trust had. That the property was preserved, charged, indeed, with a debt, which had already accumulated, and for which it was liable, but said debt not to be enforced against it save only in the event its contract be wrested from the city and with the specific declaration that the trust was to be enforced in accordance with its original intentions, and for the uses and benefit alone of the colored people of the city of Houston and Harris county, in which to hold their emancipation and other celebrations and enjoyments.

We fail to see any error in the action of the court in so entering its order. The intent is manifest that it was solely for the benefit of the uses for which it was originally intended. So believing, after a careful examination of

the record, we find no error in the action of the lower court which would justify this court in reversing the cause, and we believe that the colored people of Houston and Harris county have not only had a fair and impartial trial at the hands of the lower court, but that its action can, in every way, be justified in equity.

The assignments of error made by appellants are overruled, and the judgment of the lower court is in all matters affirmed. It is so ordered.